

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00102-CV

**IN THE INTEREST OF K.J.G.**, Jr., et al.

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-01856
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Luz Elena D. Chapa, Justice
Irene Rios, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: August 21, 2019

AFFIRMED

Appellant mother J.J.[1] appeals the trial court's order terminating her parental rights to her four children, eight-year-old K.J.G., Jr., four-year-old L.L.M., two-year-old M.M.M., and I.W.M. who was less than one year old at the time the Texas Department of Family and Protective Services (Department) filed its petition. Parental rights may be terminated only upon proof of clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)-(2). After a bench trial, J.J.'s parental rights to the children were terminated pursuant to subsections 161.001(b)(1)(E), (O), and (P) and a finding of best interest.

---

[1] To protect the identity of the minor children, we refer to the parties by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

On appeal, J.J. challenges the legal and factual sufficiency of the evidence to support all of the trial court's findings and contends her trial counsel rendered ineffective assistance during trial. We affirm the trial court's order.

## BACKGROUND

Three witnesses testified during the portion of the January 23, 2019 bench trial devoted to termination of J.J.'s parental rights: appellant J.J.; April Musquiz, the first caseworker for the Department; and Alyssa Cordova, the second caseworker for the Department.[2]  In its brief, the State refers to allegations listed in the family service plan, service plan evaluations, and CASA reports as evidence supporting the trial court's findings, arguing the trial court took judicial notice of its file.  The trial court stated on the record that it was taking judicial notice of "the pleadings, the court orders, service plans, service of process documents, State's Exhibit 1 [father K.G.'s judgment of conviction], and CASA reports," but "no affidavits."  A trial court may take judicial notice that a pleading has been filed or an order has been signed in the case, or the law of another jurisdiction; therefore, the court may properly take judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements.  *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.); *see also In re B.R.*, 456 S.W.3d 612, 617 n.4 (Tex. App.—San Antonio 2015, no pet.).  The trial court may not, however, take judicial notice of the *truth* of any allegations in its records, including allegations by the caseworker in the family service plan or evaluation, any affidavits, or CASA reports.  *In re J.E.H.*, 384 S.W.3d at 870; *In re B.R.*, 456 S.W.3d at 617 n.4.  In our appellate review, we are limited to the evidence admitted at trial.  *See In re J.C.R.*, No. 04-18-00949-CV, 2019 WL 2110109, at *2 n.2 (Tex. App.—San Antonio May 15, 2019, pet. denied) (mem. op.).

---

[2] The court notes that the transcript of the joint trial for all three parents is a mere 68 pages.

*Mother's Testimony*

The first witness was J.J., who testified her four children were removed from her care by the Department in August 2017 based on concerns of an unstable home and medical neglect of K.J.G., Jr., who has sickle cell anemia, asthma, and allergies. According to J.J., the case started off as a Family Based case due to issues concerning treatment of K.J.G., Jr.'s asthma. J.J. testified she went to a medical clinic seeking a prescription for her depression medication and that is when the CPS case started. J.J. stated K.J.G., Jr. was up to date on his medical treatment when the case began and she understands K.J.G., Jr.'s medical needs: he takes preventive medications for his sickle cell condition and allergies and has an "as needed" medication for asthma. She did not attend K.J.G., Jr.'s medical appointments during the case because she was not told about them.

J.J. testified she completed all the services on her family service plan including parenting class, counseling, the psychosocial and psychological assessment, the drug assessment, OSAR[3], and Visitation Expectations, but then conceded she did not complete outpatient drug treatment because she needed a referral that she never received. She denied perming her hair to try to tamper with the results of hair follicle drug tests. J.J. testified her service plan was "changed repeatedly," but confirmed that Cordova made her aware of what she needed to do to finish her services. J.J. stated she engaged in counseling but did not believe her depression had been fully addressed.

When asked whether she had stable housing, J.J. answered, "Yes," explaining that she had been staying with a friend for two weeks and the friend planned to seek a larger place for them to live if J.J. and the children were reunited. J.J. acknowledged staying at three or four different places during the course of the case and living with the children in a shelter in August 2017. She stated she understood the Department's concerns about stability and how it was harmful to the

---

[3] OSAR is an acronym for the Outreach, Screening, Assessment, and Referral services.

children to move around so often. J.J. testified she had a job as a warehouse laborer for the last two years, but admitted she worked "periodically;" she stated she maintained employment during the case "for the most part." She was not working at the time of trial because she gave birth a few weeks earlier; she hoped to return to work "next week." Finally, J.J. testified she was currently on probation for a September 2017 charge of possession of a weapon. J.J. denied any domestic violence incidents in her relationship with H.M., the father of the three youngest children, and testified the relationship ended shortly before the children's removal.

*Testimony of the Department Caseworkers*

April Musquiz, a caseworker for the Department, testified she received the case in August 2017 and was the caseworker for only four months. According to Musquiz, the initial allegations were for "physical neglect" based on the children being exposed to drugs in the home, "medical neglect" of K.J.G., Jr.'s condition, and "physical abuse." Musquiz testified she believed K.J.G., Jr. was not "getting the right medical attention" for his sickle cell and asthma conditions – however, she did not speak to J.J. about it at the time. When asked on cross-examination how J.J. would know "what brought the case into play," Musquiz stated she "didn't go into detail about medical neglect" with J.J. Musquiz stated she did talk to J.J. in detail about her service plan. J.J. signed her service plan and understood what she had to do when Musquiz discussed it with her in September 2017. Musquiz stated J.J. did not have stable housing during the four months she was the caseworker and did not engage in services during that period. J.J. tested positive in August 2017 for cocaine and marijuana. Musquiz did not recall whether that drug test was a hair follicle test or a urinalysis.

The current caseworker, Alyssa Cordova, testified that she received the case in January 2018. Cordova requested several drug tests from J.J. during the case and recalled having some refusals from J.J., but she could not recall how many. J.J. had positive drug test results during the

case, most recently in August 2018 for cocaine. Cordova stated she had a concern that J.J. was getting her hair permed to tamper with the hair follicle drug tests; however, she did not specify what caused her to draw that conclusion. Part of J.J.'s service plan was to follow any recommendations made by OSAR. Cordova testified J.J. did not complete the outpatient drug treatment and psychiatric treatment recommended after the OSAR assessment, and thus failed to fully comply with her service plan. In Cordova's opinion, drug treatment was one of the most important services for J.J. Cordova testified OSAR gave J.J. a referral for the outpatient drug treatment and she took the necessary steps on her end to facilitate the recommended treatment. Cordova testified she did not believe J.J. had addressed her substance abuse issues and was concerned drug use might be an ongoing issue in the future. The other most important service for J.J. was psychiatric treatment. Her psychological assessment led to a diagnosis that J.J. suffered from post-traumatic stress disorder (PTSD) and mixed personality disorder in addition to depression. Cordova testified that, to her knowledge, J.J. did not engage in psychiatric treatment for those mental health issues; the record is silent on whether a referral was made for psychiatric treatment. Because J.J. failed to complete the recommended drug and psychiatric treatment and also failed to accept responsibility for the reasons for removal, Cordova did not believe J.J. had addressed the issues that led to the Department's involvement.

Cordova also testified that J.J. lived at several different places during the case and told her she worked at a warehouse; however, J.J. never provided Cordova with any pay slips or other documentation. In addition, Cordova stated J.J. was the victim of two domestic violence incidents with H.M., father of the three youngest children, during the case. Cordova did not believe either J.J. or H.M. had addressed the domestic violence issue but stated that, to her knowledge, they were not currently living together. Cordova testified she does not believe J.J. can meet the children's needs because "[d]espite attending the parenting classes, the counseling, the drug assessment, and

the psychological, [J.J.] has failed to address her psychiatric mental health needs, she has failed to address the substance abuse issues, and she has failed to demonstrate stability or the ability to parent."

## SUFFICIENCY OF THE EVIDENCE

A trial court may terminate an individual's parental rights, severing the parent-child relationship, only upon a showing, by clear and convincing evidence, that one or more statutory grounds for termination exists, and the termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. This heightened standard stems from the permanency and unalterable changes that termination of a parent-child relationship causes both the parent and child. *In re D.M.*, 452 S.W.3d 462, 469 (Tex. App.—San Antonio 2014, no pet.).

In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We give "appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review," by "assum[ing] that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* "A corollary to this requirement is that [we] should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* "This does not mean that [we] must disregard *all* evidence that does not support the finding." *Id.* (emphasis in original). "Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing

evidence." *Id.* "If, after conducting [our] legal sufficiency review of the record evidence, [we] determine[] that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then [we] must conclude that the evidence is legally insufficient." *Id*. at 344-45.

In reviewing the factual sufficiency of the evidence, we give deference to the factfinder's findings, but also consider and weigh the disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. In conducting a factual sufficiency review, we cannot substitute our judgment for that of the factfinder. *In re D.M.*, 452 S.W.3d at 469 (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

### A. Findings Pursuant to Section 161.001(b)(1)

With respect to the predicate grounds for termination, the trial court found by clear and convincing evidence that J.J. had: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children under subsection (E); (2) failed to comply with the provisions of the court-ordered family service plan under subsection (O); and (3) used a controlled substance in a manner that endangered the health or safety of the children, and failed to complete a court-ordered substance abuse treatment program under subsection (P). TEX. FAM. CODE ANN. §161.001(b)(1)(E), (O), and (P). Only one of these three statutory grounds is necessary to support the trial court's order terminating J.J.'s parental rights where there is also a finding that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, the supreme court recently held that, because termination on an endangerment ground may later be used to terminate parental rights to another child, the courts of appeals must review the sufficiency of the evidence to support a

challenged endangerment finding under subsection (D) or (E) even if termination is supported by an alternative statutory ground. *In re N.G.*, No. 18-0508, 2019 WL 2147263, at \*2-3 (Tex. May 17, 2019) (per curiam) (due to the collateral consequences of a prior termination based on endangerment, due process and due course of law require appellate review to determine whether the evidence of endangerment met the heightened clear and convincing standard). Here, J.J. challenges the trial court's finding under subsection (E), as well as the other two statutory grounds. We begin by reviewing the trial court's endangerment finding.

### *Endangerment under Subsection (E)*

Under subsection (E), the relevant inquiry is whether there is evidence that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Conduct" as used in this subsection includes both the parent's acts and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d at 125. The conduct need not occur in the child's presence and may occur both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Scienter is not required for a parent's own acts or omissions under subsection (E); it is only a requirement when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

An endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury. *In re P.W.*, No. 14-18-01070-CV, 2019 WL 2352443, at \*8 (Tex. App.—Houston [14th Dist.] June 4,

2019, no pet. h.). "[R]ather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id.* Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *See id.*; *see also A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.). Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E). *In re J.O.A.*, 283 S.W.3d at 346; *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs may qualify as an endangering course of conduct.").

There was uncontroverted evidence that J.J. tested positive for cocaine and marijuana at the time of the children's removal in August 2017 and then tested positive for cocaine one year later in August 2018 while the case was on-going. Thus, J.J. continued to use drugs during the pendency of the case despite her knowledge that her parental rights were in jeopardy.[4] Evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's well-being. *See In re J.O.A.*, 283 S.W.3d at 346; *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Cordova testified that J.J.'s most recent positive drug result was the August 2018 test, one year after removal of the children and five months before trial. A reasonable inference can be drawn that J.J. was pregnant at the time of the positive drug test in August 2018 because she

---

[4] Cordova also testified she requested "several" drug tests from J.J. and received "some refusals."

testified that she gave birth on January 5, 2019, a few weeks before trial. *See In re I.A.V.*, No. 11-19-00044-CV, 2019 WL 3492376, at *3 (Tex. App.—Eastland Aug. 1, 2019, no pet. h.) (mem. op.) (considering mother's positive cocaine results during pregnancy in affirming trial court's finding she engaged in a course of conduct that endangered her children under subsection (E)). J.J. testified that the baby did not test positive for drugs at birth and was still in her care at the time of trial. On appeal, she argues the test result shows she has been drug-free since the positive drug test in August 2018. Even if such an inference was drawn, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346.

A parent's commission of criminal conduct, whether illegal drug use or commission of another crime, may constitute endangering conduct under subsection (E) due to the risk of incarceration. *See Walker*, 312 S.W.3d at 617 ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."). Here, in addition to the positive drug tests, J.J. admitted being placed on probation for possession of a weapon in September 2017, one month after the children were removed by the Department. Regardless of the disposition of the charged offense, the *commission* of criminal conduct by a parent exposes the children to the possibility that the parent may be imprisoned and is a factor that may support an endangerment finding under subsection (E). *See In re K.-A.B.M.*, 551 S.W.3d 275, 286-87 (Tex. App.—El Paso 2018, no pet.) (in the context of endangerment of child, the commission of the criminal conduct is the key, even if the charge was ultimately dismissed).

Further, it is undisputed that J.J. did not participate in the required outpatient drug treatment — one of the most important services she needed to complete according to Cordova. The trial court could have disbelieved J.J.'s explanation for not attending the drug treatment (the referral

was missing) and believed Cordova's testimony that OSAR made the referral and she did everything necessary on her part for J.J. to participate.

The evidence also shows that J.J. failed to obtain and maintain a stable home and continuous employment as required by her service plan during the almost eighteen-month pendency of the case. J.J. lived in a shelter with the children prior to removal, moved three to four times during the case, and had only been in her current living situation, staying in a friend's apartment, for the two weeks preceding trial. J.J. testified the friend was willing to find a larger place to live if J.J.'s children moved in because the current apartment was not large enough to accommodate J.J.'s four children. While J.J. testified she had worked as a warehouse laborer for "probably two years," she later admitted working only "periodically" during that timeframe. At trial, J.J. stated she planned to return to work "next week" since she had just recently given birth. Cordova testified that J.J. never provided any proof of her employment or submitted pay slips as required by her service plan.

Cordova testified that during the case there were "two incidents of domestic violence in which J.J. was the victim." However, no details concerning the domestic violence were developed. J.J. denied that any domestic violence occurred. Conclusory testimony is no evidence and cannot support a judgment. *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013); *see In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (caseworker's conclusory testimony, even if uncontradicted, does not amount to more than a scintilla of evidence). The record contains no competent evidence of domestic violence.

Finally, there was some evidence that J.J. had mental health issues. J.J. testified she had depression and was taking medication for it when the case began. She testified it was her belief the CPS case started when she attempted to obtain her depression medication from a walk-in clinic and that she was unable to obtain the medication during the almost-two-year pendency of the case

because she was afraid to ask for it. While J.J. testified she was using other methods to handle her depression during the case, which were helping, she also testified she did not believe her depression had been adequately addressed. According to Cordova, the OSAR psychological assessment also diagnosed J.J. with PTSD and mixed personality disorder, in addition to depression. That is the extent of the evidence pertaining to J.J.'s mental health issues. No evidence was presented to show how J.J.'s mental health condition affects her personally nor to show whether or how her condition impairs her ability to function as a parent to her children. A mere diagnosis of a mental health condition by itself does not constitute any evidence of endangerment to the person's children. *See In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *20 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) ("[m]ental illness alone is not a basis for terminating the parent-child relationship"); *see also In re E.F.*, No. 04-18-00635-CV, 2019 WL 2194539, at *8 (Tex. App.—San Antonio May 22, 2019, no pet.) (Chapa, J. dissenting).

Viewing all the evidence in the record in the light most favorable to the trial court's finding of endangerment, as we must in a legal sufficiency review, we conclude the evidence is sufficient to support the finding of endangerment under subsection (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). The evidence shows J.J. used cocaine before the children's removal and continued to use cocaine during the pendency of the case even though she knew her parental rights were in jeopardy. *See In re J.O.A.*, 283 S.W.3d at 346; *In re M.E.-M.N.*, 342 S.W.3d at 263; *Cervantes-Peterson*, 221 S.W.3d at 253-54. The evidence also shows that J.J. failed to obtain and maintain stable housing and employment during the almost eighteen-month pendency of the case. Both courses of conduct subject her children to a life of uncertainty and instability, and endanger their physical and emotional well-being. *See In re P.W.*, 2019 WL 2352443, at *8.

With regard to factual sufficiency, J.J. argues that no drug tests were introduced into evidence and there was no evidence she used drugs in the children's presence. The results of the

drug tests were introduced in evidence through the caseworkers' testimony, without objection.[5] During her testimony on recall, J.J. did not dispute Cordova's testimony about the positive drug test results. Further, it is not necessary that the endangering course of conduct occur in the child's presence. *See Walker*, 312 S.W.3d at 617. In considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's finding that J.J. endangered her children pursuant to subsection (E).

We therefore hold the evidence is both legally and factually sufficient to support a firm belief or conviction that J.J. engaged in a course of conduct that subjected her children to a life of uncertainty and instability thereby endangering the physical and emotional well-being of her children. *See A.S.*, 394 S.W.3d at 712; *In re M.R.J.M.*, 280 S.W.3d at 503; *In re K-A.B.M.*, 551 S.W.3d at 287; *Walker*, 312 S.W.3d at 617.

Based on our holding that the evidence is sufficient to support the trial court's finding of endangerment under subsection (E), we need not address the other two statutory grounds for termination under subsections (O) and (P) and proceed to the issue of best interest. *See In re A.V.*, 113 S.W.3d at 362.

### B. Best-Interest Finding Pursuant to Section 161.001(b)(2)

J.J. contends the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code.

---

[5] In her second issue, J.J. asserts her trial counsel was ineffective for failing to object to the caseworker's testimony about positive drug tests.

*See* TEX. FAM. CODE ANN. §263.307(b).[6] In addition to these statutory factors, in considering the best interest of the child, a court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). These factors include, but are not limited to: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d at 249 n.9; *Holley*, 544 S.W.2d at 371-72.

As discussed above, the evidence supported the trial court's finding that J.J. engaged in a course of conduct that endangered the physical and emotional well-being of her children by using

---

[6] These factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

illegal drugs before and during the case and by failing to obtain and maintain stable housing and employment, thereby subjecting the children to a life of uncertainty and instability. Evidence that proves a statutory ground for termination is also probative on the issue of best interest. *In re C.H.*, 89 S.W.3d at 28. J.J. did not engage in the recommended drug treatment, and Cordova expressed concern that illegal drug use could be a continuing problem for J.J. in the future. A trial court may evaluate a parent's future conduct by considering past conduct when determining best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Cordova also testified that J.J. had not accepted responsibility for her conduct that led to the children's removal and had not demonstrated the ability to meet the children's needs.

With respect to the children and their needs, the record shows J.J. completed the parenting classes and visited the children consistently. Cordova testified her initial concerns about the appropriateness of J.J.'s redirection of the children were addressed. Cordova stated K.J.G., Jr.'s medical needs are "very high" – he is on psychotropic medication; he also requires medication when he goes into a crisis and has to be carried around because he cannot move due to the pain; he requires a consistently healthy diet and hydration; and he has exercise restrictions. However, Cordova did not specify why J.J. is unable to manage these medical requirements. K.J.G., Jr. is currently in a foster home with a paternal relative in Louisiana; it is a foster-to-adopt home pending completion of an ICPC,[7] which is the home study conducted when placement is in a state outside of Texas. K.J.G., Jr.'s needs are currently being met in the foster home but, according to Cordova, there are concerns about the foster mother's ability to meet his medical needs. J.J. testified K.J.G., Jr. has had two or three sickle cell crises in the foster home, which is more than he had been having in her care. J.J. testified she knew how to treat K.J.G., Jr.'s medical conditions. Thus, other than

---

[7] An ICPC is the acronym for Interstate Compact on the Placement of Children.

Musquiz's testimony that there were initial allegations about medical neglect of K.J.G., Jr. and she "believed" he was not getting the proper medical treatment, no evidence was introduced to show that J.J. medically neglected K.J.G., Jr.'s needs. *See Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) ("Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence"); *Cornyn v. Speiser*, 966 S.W.2d 645, 651 (Tex. App.—San Antonio 1998, pet. denied) (noting that a witness's subjective beliefs are no more than conclusions and therefore are not competent evidence); *see also In re A.H.*, 414 S.W.3d at 807.

The youngest three children are placed together in a separate foster-to-adopt home that is safe and stable and meets their needs. The children are bonded with their foster mother and have expressed to Cordova that they want to stay with her. Cordova testified that when she visits the children, they are always hugging on the foster mother.

Finally, Cordova testified that all four children have been in care for almost two years and are in need of stability and closure. She explained that the children's behaviors have "continually gotten worse throughout this case." K.J.G., Jr. has gotten into trouble at school for punching other children; L.L.M. has been hitting and fighting and has also stolen; and M.M.M. "continues to have accidents on herself." Cordova stated the foster families are dealing with the children's behaviors well and appropriately. The three youngest children are in contact with K.J.G., Jr. and their foster mother is committed to maintaining the sibling contact. Cordova testified that, in her opinion, termination of J.J.'s parental rights is in the best interests of the children.

Viewing all the evidence in the light most favorable to the trial court's finding, we conclude the evidence is legally sufficient to support the trial court's finding that termination of J.J.'s parental rights is in the children's best interests. *See In re J.O.A.*, 283 S.W.3d at 344.

With regard to factual sufficiency, J.J. points to the following evidence: (1) Cordova's testimony that the children's behaviors have gotten "continually worse" during their placement;

(2) her own testimony that K.J.G., Jr. has had two or three sickle cell crises in the foster home, which is more than he had been having when he was in J.J.'s care; (3) her own testimony that her newborn baby was born healthy in January 2019, did not test positive for illegal substances, and remains in her care; and (4) her testimony that she currently has a place to live and the friend plans to obtain a larger home to accommodate the children, and she planned to return to work shortly.

With respect to the children's behaviors having worsened, the trial court could have believed Cordova's testimony that the children's behavior reflected their need for stability and closure of the long-pending case. J.J. did not provide any medical records or other documentation or witness testimony to support her testimony about the number of sickle cell crises K.J.G., Jr. suffered before removal or the health and negative drug status of her newborn baby. As the factfinder, the trial court could have disbelieved J.J. on these issues. With respect to J.J.'s planned housing situation for the children, she had only been staying at the friend's apartment for two weeks and the current apartment was not large enough for J.J.'s children to live there. As noted, no proof of J.J.'s income or employment status was submitted to Cordova or presented at trial to corroborate her testimony that she had a job waiting and could return to work "next week." The trial court, in looking at all the relevant factors, could have concluded that termination of J.J.'s parental rights was in the best interest of K.J.G., Jr., L.L.M., M.M.M., and I.W.M. Therefore, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's finding that termination of J.J.'s parental rights was in all the children's best interests. *See id.*

### Conclusion

We therefore hold that the evidence is legally and factually sufficient to support the trial court's findings that termination of J.J.'s parental rights was warranted under section 161.001(b)(1)(E) and (2) of the Family Code.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

In her second issue, J.J. claims she was denied effective assistance of counsel because drug evidence "repeatedly came in" during trial and her trial counsel did not object to the caseworkers' testimony about the results of her drug tests. She contends that no competent attorney would have allowed unobjected-to testimony regarding drug use into evidence in a parental termination case.

The State asserts that this issue is inadequately briefed and therefore nothing is presented for review. *See* TEX. R. APP. P. 38.1(i). Although we agree the briefing on this issue is minimal and multifarious, we will address the claim of ineffective assistance on its merits in the interest of justice.

The statutory right to counsel in termination of parental rights cases includes a guarantee that counsel will perform effectively. *In re B.G.*, 317 S.W.3d 250, 253-54 (Tex. 2010) (adopting the standard for effective assistance of counsel in criminal cases); *In re M.S.*, 115 S.W.3d 534, 544-45 (Tex. 2003) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To prove a claim of ineffective assistance of counsel under *Strickland*, a defendant must prove by a preponderance of the evidence both that (1) her counsel's performance was deficient and (2) the deficient performance prejudiced her defense. *In re M.S.*, 115 S.W.3d at 545 (citing *Strickland*, 466 U.S. at 687).

In reviewing an ineffectiveness claim, an appellate court affords "great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id*. (quoting *Strickland*, 466 U.S. at 689). Only when conduct is "'so outrageous that no competent attorney would have engaged in it'" will an appellate court determine the conduct amounted to ineffective assistance of counsel. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

An appellant bears the burden of overcoming the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. When the record is silent concerning the reasons for trial counsel's actions, an appellate court does not engage in speculation to find ineffective assistance of counsel. *See Walker*, 312 S.W.3d at 623. Accordingly, ineffective assistance claims must be firmly found in the record, and the record must affirmatively show the alleged ineffectiveness. *Id.*

Here, J.J. did not file a motion for new trial, and her trial counsel was not afforded an opportunity to respond to the allegation of ineffective assistance of counsel. Thus, no explanation as to any potential trial strategy has been given. J.J presents no argument other than to say no competent attorney would have failed to object to the caseworker's testimony about J.J.'s drug test results. In considering the entire record, we disagree with J.J that her trial counsel could have no possible sound trial strategy in failing to object to the caseworkers' testimony regarding her drug test results. *See In re L.C.W.*, 411 S.W.3d 116, 128-29 (Tex. App.—El Paso 2013, no pet.) (holding evidence not firmly founded in the record when appellant argued counsel, among nine other allegations, "failed to object to drug testimony"). We conclude J.J. has not met her burden of overcoming the presumption that trial counsel's conduct could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. Further, J.J. makes no argument as to how counsel's purported deficient performance prejudiced her defense and has therefore failed to meet her burden to show prejudice. *See In re M.S.*, 115 S.W.3d at 550 (citations omitted) (the prejudice prong of *Strickland* requires appellant to show "there is a reasonable probability that, but for her counsel's unprofessional errors, the result of the proceeding would have been different."). We hold that J.J. has failed to show she was denied effective assistance of counsel.

## CONCLUSION

Based on the foregoing, we affirm the trial court's order terminating J.J.'s parental rights to her four children.

Liza A. Rodriguez, Justice